**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0119n.06
Filed: February 26, 2008

**No. 06-4209**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| JIMMIE G. HINTZ, | ) | NORTHERN DISTRICT OF OHIO |
| | ) | |
| Defendant-Appellant. | ) | |

Before:  MARTIN and SUTTON, Circuit Judges; and OBERDORFER, District Judge.[*]

OBERDORFER, District Judge.  A federal jury convicted Jimmie Hintz of conspiracy, armed bank robbery, and use of a firearm during a crime of violence for his role as a "getaway" driver in a bank robbery in Elyria, Ohio.  Hintz contends that there is insufficient evidence to support his conviction.  Because a rational juror could have concluded that Hintz was guilty, we affirm.

I.  BACKGROUND

A.     Facts

In the afternoon of February 24, 2005, a gun-wielding, masked white man of medium build, wearing loose-fitting jeans and a blue shirt, entered National City Bank on Midway Boulevard in

---

[*] The Honorable Louis F. Oberdorfer, United States District Judge for the District of Columbia, sitting by designation.

Elyria, Ohio, from its parking-lot entrance door. Joint Appendix ("JA") 79, 84, 87, 88, 94. Present were two tellers, the office manager, and one customer. JA 79, 81. Upon demand, one teller gave the man money, including "bait money"—traceable bills that trigger an alarm when moved. JA 95, 102. The bank's records showed that the alarm sounded at 1:13 p.m. and that the police were called at 1:15 p.m. JA 108, 110. The robber then exited by the parking-lot doors through which he had entered. JA 83. As the robber was leaving, one teller saw in the parking lot the "back end of a newer looking car." JA 83, 89, 92. She did not notice it when the robber was entering the bank. JA 83, 89, 92. She could not see inside the car, as it was disappearing from her view. JA 84, 89. A later audit showed that $2,189 was missing from the tellers' drawers. JA 101.

A surveillance camera at a store near the bank had recorded two alternating views of the parking lot. JA 116, 140. The video showed a stationary Ford Taurus in the parking lot at 1:07 p.m. facing southbound toward the bank. JA 120. At approximately 1:12 p.m., the car disappeared from the camera's view to the west (to the right). JA 124. At 1:16 p.m., the car reappeared in view as it moved toward the door at the bank. JA 124. There it paused, and a blur appeared on the passenger side of the Taurus indicating "some kind of activity." JA 124, 127–28. The Taurus then moved past the door, stayed there momentarily, and left the parking lot. JA 124, 127. The video did not show how many people were in the Taurus. JA 126, 139.

Officers reviewed this video at the scene. JA 208. At about 1:48 p.m., they broadcast notice of an armed robbery by a white male in jeans and a blue shirt possibly traveling westbound on the Turnpike in a silver Ford Taurus with an Ohio plate. JA 208. An Ohio Highway Patrol Officer,

Brian Hann, working on the Ohio Turnpike just west of Elyria that afternoon, received the dispatch and prepared to watch for the car. JA 209. A Taurus approached at about 2:12 p.m., appearing to be going the speed limit, with no visible license plate or registration on the front, and an Ohio plate in the rear. JA 209, 210. As Officer Hann pulled behind the Taurus, it made an abrupt lane change and entered a service plaza. JA 209. Officer Hann followed the car into the plaza. JA 211. He observed the driver—later identified as co-defendant Jason Bricker—wearing blue jeans and a blue T-shirt as he exited the car to fuel it. JA 211, 212, 214. There was also a passenger, later identified as Hintz. JA 211, 216. Officer Hann called for backup and then followed the Taurus westbound at a normal speed. JA 212. When the Taurus exited the Turnpike, Hann and the backup officer pulled it over. JA 213.

Officer Hann placed Bricker in handcuffs, told him that he was in investigative custody, and asked him where he was coming from. JA 213. Bricker replied that he was coming from Ashland, where he lived. JA 213, 215. Hintz also said that he was coming from Ashland and that he was going to Finley to visit his girlfriend. JA 216, 228. But Hintz then said that he was picked up in Elyria, where he lived at a mobile-home park. JA 170, 228. Officer Hann read Hintz his *Miranda* rights, and then asked him more questions, which led to Hintz's responses that he had known Bricker for about two years. JA 222. Hintz said that he had no idea what time Bricker had picked him up. JA 222.

The officers towed the Taurus to a garage where they conducted an inventory search in the presence of Bricker and Hintz. JA 162. The officers discovered $2,079, including the bait money,

in the console of the Taurus. JA 162–63, 170. Additionally, Bricker had $161 in his wallet, and Hintz had about $60 or $70 in his. JA 170. In the trunk, there was a black, zipper-hood sweatshirt containing a loaded, .32-caliber revolver; a pair of white gloves; a blue ski mask; and black tennis shoes. JA 165–67. In the back seat, there was a ski mask and black jacket. JA 181. At some point the officers also learned that the Taurus's license plate had been reported stolen one week earlier. JA 166.

The police suspected that Hintz was the getaway driver. JA 281. Agent Edward Satterfield obtained a lead that the getaway driver might be someone other than Hintz. JA 290.[1] Agent Satterfield interviewed that person at home about a week later; that person had an alibi for his whereabouts at the time of the robbery. JA 290–91, 293. To test Hintz's claim that Bricker had picked Hintz up at home after the robbery, Agent Satterfield, on another afternoon, drove the route he believed Bricker would have followed to do that. JA 269. It took Agent Satterfield approximately 74 minutes to make the trip from the bank to Hintz's home and then to where Officer Hann spotted the Taurus—approximately 15 minutes longer than the time between the robbery and when Officer Hann actually spotted the Taurus. JA 268–69.

B.    Procedural History

On July 7, 2005, a federal grand jury in Cleveland, Ohio, returned a superseding indictment charging Hintz and Bricker with conspiracy to commit bank robbery, *see* 18 U.S.C. § 371 (Count

---

[1]The source of this lead (Bricker) was not identified to the jury. JA 285.

1); armed bank robbery, *see* 18 U.S.C. § 2112(a) and (d) (Count 2); and use of a firearm during a crime of violence, *see* 18 U.S.C. § 924(c)(1) (Count 3). JA 24–30. Bricker plead guilty. JA 407. On April 10, 2006, Hintz went to trial.

After presentation of the evidence discussed above, Hintz moved for acquittal. JA 303. His attorney acknowledged that "it's clear that Jason Bricker committed this crime," but contended that there was "no substantial evidence" that Hintz was involved, "other than him being a passenger in the car." JA 303.

The court denied the acquittal motion. The court explained that "[t]here certainly is evidence from which a jury could conclude beyond a reasonable doubt that a robbery was committed and that it was perpetrated by more than one person, someone other than Mr. Bricker, because someone was driving that car and moving that car, other than Mr. Bricker." JA 305. Additionally, "the jury . . . heard evidence that less than one hour after the bank was robbed, Mr. Hintz was found in the car with Mr. Bricker, along with over $2000 that was just sitting in the console, along with some clothing in the trunk and a gun that . . . the jury could conclude was used in the robbery." JA 305.

In the ensuing closing argument, Hintz's attorney stated that it was possible to drive from the bank to where Officer Hann stopped the Taurus in less time than the hour it took before the Taurus actually was stopped, suggesting that Bricker had time to, and did, pick Hintz up after the robbery. JA 371. The jury rejected this argument and found Hintz guilty on all three counts. The district court then sentenced Hintz to 30 years in prison: 5 years for conspiracy; 25 years for armed bank

robbery (concurrent with the conspiracy sentence); and 5 years for use of a firearm during a crime of violence. JA 413. Hintz brought this appeal.

## II. DISCUSSION

"When considering a challenge to the sufficiency of evidence to sustain a conviction on direct appeal, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "The appellate court must view all evidence and resolve all reasonable inferences in favor of the government." *Id.* (citing *Jackson*, 443 U.S. at 319). "Because the issue is one of legal sufficiency, the court neither 'independently weighs the evidence, nor judges the credibility of witnesses who testified at trial.'" *Id.* (quoting *United States v. Talley*, 164 F.3d 989, 996 (6th Cir. 1999)). "An appellate court cannot substitute its judgment for that of the jury." *Id.* (citing *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993)). Moreover, "circumstantial evidence alone can sustain a guilty verdict and . . . [such] evidence need not remove every reasonable hypothesis except that of guilt." *Id.* (quoting *United States v. Stone*, 748 F.2d 361, 362 (6th Cir. 1984)). "This standard is a great obstacle to overcome and presents the appellant in a criminal case with a very heavy burden." *Id.* (citations omitted). The elements of each count for which Hintz was convicted are as follows:

*Conspiracy.* To prove conspiracy under 18 U.S.C. § 371, the government must show (1) the existence of an agreement to violate the law; (2) knowledge and intent to join the conspiracy; and

(3) an overt act constituting actual participation in the conspiracy. *Hughes*, 505 F.3d at 593. A tacit or material understanding among the parties to a conspiracy is sufficient to establish the agreement, and conspiracy may be inferred from circumstantial evidence that may reasonably be interpreted as participation in a common plan. *Id.*

*Armed Bank Robbery.* To prove armed bank robbery under 18 U.S.C. § 2113(a) and (d), the government must show (1) that by force or threat of force; (2) the defendant attempted to take from a person in another's presence an item of value; (3) that is in the custody or control of a bank; and (4) in doing so, placed in jeopardy the life of any person by use of a dangerous weapon or device. *United States v. Davis*, 306 F.3d 398, 408–409 (6th Cir. 2002). Hintz was convicted of this count and the final count (the firearm charge discussed below) as an aider and abettor, making him as guilty of the substantive offenses as the principal. *Id.* at 409. Aiding and abetting requires that a defendant "in some sort associate himself with the venture, that he participates in it as something he wishes to bring about, and that he seek by his action to make it succeed." *Id.* (citation omitted). Thus, aiding and abetting involves (1) an act by a defendant that contributes to the execution of a crime, and (2) the intent to aid in its commission. *Id.*

*Use of a Firearm During a Crime of Violence.* To prove aiding and abetting the use of a firearm during a crime of violence under 18 U.S.C. § 924(c), the government must show that the defendant associated and participated in the use of the firearm in connection with the underlying crime. *United States v. Franklin*, 415 F.3d 537, 545 (6th Cir. 2005). "The government must show that the defendant was a participant rather than merely a knowing spectator, that his presence at the

scene of the crime was not surplusage, and that the crime would not have transpired without him." *Id.* "This can be satisfied if the accomplice knows that the principal is armed and acts with the intent to assist or influence the commission of the underlying predicate crime." *Id.*

Hintz acknowledges that the evidence shows that Bricker committed the bank robbery, but argues that the evidence is insufficient to show his own participation. We disagree.

First, there was evidence of an accomplice at the scene of the robbery because the surveillance video indicated that the Taurus moved during the time of the robbery. Consistent with this, the first teller stated that she saw the back end of the car when the robber left, but did not notice it when he first appeared.

Second, there was substantial evidence that Hintz was that accomplice. After the robbery, he was in the car with the bank money, ski masks, and the gun. He contends only that "it is *certainly conceivable* that [after the robbery] Jason Bricker picked him up at the mobile home park where he lived and then entered the turnpike." Hintz's Br. at 14 (emphasis added). But, though this possibility might be "conceivable," he makes no showing that he could not have been driving the getaway car at the time of the crime. *Cf. Hughes*, 505 F.3d at 592 (noting that the "evidence need not remove every reasonable hypothesis except that of guilt"). Indeed, Agent Satterfield's retracing of this alleged route took 15 minutes longer than it took for the Taurus to travel from the bank to Officer Hann's location, suggesting that Bricker had not detoured to pick up Hintz at home but that Hintz had been with Bricker all along. Hintz also gave inconsistent statements when stopped, first

saying that he was coming from Ashland and then saying that he was coming from Elyria. Although the police who stopped the Taurus found Bricker driving with Hintz in the passenger seat, a reasonable juror could have found that Hintz switched places with Bricker at some point after the robbery. Finally, it is unlikely that there was a getaway driver other than Hintz because all of the money was found in the car with Bricker and Hintz; a reasonable juror could also have found that another participant would have taken his share of the loot.

Accordingly, sufficient evidence exists for a reasonable juror to conclude that Hintz was guilty of each charge. His role as the getaway driver established his (1) participation in a common plan, showing conspiracy, *Hughes*, 505 F.3d at 593; and (2) aiding and abetting both the armed robbery and the use of a firearm during the armed robbery—events that he wished to bring about and sought to make succeed, *Davis*, 306 F.3d at 409. This evidence is consistent with that in other armed bank-robbery cases. *See United States v. Tate*, 575 F.2d 1152, 1154 (6th Cir. 1978) (both defendants were arrested in a car containing bait money from the robbed bank and an eyewitness identified one defendant as the robber); *United States v. Cooper*, 375 F.3d 1041, 1049–50 (10th Cir. 2004) (defendant was found less than 24 hours after the robbery near his car, which met the description of the getaway car and contained bait money and the same kind of mask used by the robber); *United States v. Bennett*, 908 F.2d 189, 196 (7th Cir. 1990) (defendant was arrested in motel surrounded by weapons, cash, and a wig matching the description of the getaway driver's hair color).

The cases Hintz relies on involve improper sentencing enhancements or convictions where the defendant was merely present with the principal perpetrator. *See United States v. O'Berry*, No.

94-6536, 1996 U.S. App. LEXIS 1412, at *8 (6th Cir. Jan. 9, 1996) (rejecting firearm enhancement for passenger in car where gun was found); *United States v. Cochran*, 14 F.3d 1128 (6th Cir. 1994) (same); *United States v. Tincher*, No. 92-3796, 1993 U.S. App. LEXIS 33340, at *11 (6th Cir. Dec. 21, 1993) (finding insufficient evidence where defendant was seen talking to his brother who had recently passed a counterfeit bill).  Here, by contrast, sufficient evidence showed that Hintz was more than simply associating with Bricker; a reasonable juror could infer—based on the surveillance video suggesting that the car repositioned itself, the teller's testimony consistent with that repositioning, and Hintz's presence in the car with the bank money shortly after the robbery—that he was the getaway driver.

## III.  CONCLUSION

For the foregoing reasons, we affirm.