NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0109n.06
Filed: February 20, 2008

No. 07-1202

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

DONALD ERICH MUELLER,

     Petitioner-Appellant,

v.

TOM C. BELL,

     Respondent-Appellee.

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN

_____/

BEFORE:    MOORE, CLAY and ROGERS, Circuit Judges.

     CLAY, Circuit Judge. Petitioner-Appellant, Donald Mueller, appeals from an order entered by the United States District Court for the Eastern District of Michigan denying his petition for a writ of habeas corpus under 28 U.S.C. § 2254. Specifically, Mueller contends that his state conviction for third degree criminal sexual conduct in violation of Michigan Comp. Laws § 750.520d(1)(c) was not supported by sufficient evidence and that the district court erred in finding that his state conviction was based upon a reasonable application of federal law. For the reasons that follow, we AFFIRM the judgment of the district court.

**BACKGROUND**

**A.      Factual Background**

Petitioner, Donald Mueller ("Mueller"), was convicted in Michigan state court of third degree criminal sexual conduct against Steven Shrock ("Steven").  At the time of the assault, Steven, who was 33 years old, lived at home with his parents and worked part-time at Arby's under a Michigan Rehabilitative Services program for individuals with developmental disabilities.  Every day after work, Steven visited a local donut shop where he would meet and talk with friends over coffee.  Steven first encountered Mueller during one of his regular visits to the donut shop.  Soon thereafter, Mueller began joining Steven and his friends for coffee and would often stop by Arby's to buy Steven lunch.

On March 11, 2002, Mueller invited Steven to visit his home after he finished his shift at Arby's.  Steven accepted the invitation, and Mueller picked him up after work.  When the two arrived at Mueller's home, Mueller asked Steven if he would like to see some pictures.  Mueller told Steven that before he could see the pictures he would have to follow the "house rules" and remove his pants.  Thereafter, Mueller displayed child pornography on his computer.  Mueller instructed Steven not to tell anyone about the pictures.  Sometime later, Steven called home to let his mother know where he was.  Apparently upset that Steven did not return home after work as was his usual routine, Steven's mother instructed him to return home within an hour and said that she wanted to meet Mueller prior to the two of them spending any more time together.  Prior to taking Steven home, Mueller gave him a bag of candy.

Mueller later dropped Steven off at home and met Steven's parents. When asked what the two of them had done while at Mueller's home by his parents, Steven replied that they had "watched Oprah and the news." (J.A. at 52) Steven's parents also questioned Mueller regarding his intentions toward their son. Mueller explained that he enjoyed spending time with Steven because Steven reminded him of his own son who was of a similar age and who also had a mental impairment. Mueller further explained that he had been married and rarely saw his son after his divorce. According to Steven's mother, Shirley, Mueller explained that "I'm a very lonely person . . . Steve is very upbeat, he makes me happy . . . I just really enjoy spending time with him." (J.A. at 52) Accepting Mueller's explanation as genuine, Steven's parents allowed the two to make arrangements to spend time together a few days later.

On March 13, 2002, Mueller picked Steven up from work. Prior to going to Mueller's home, Mueller stopped at a local video store and rented two pornographic videos. After the two arrived at Mueller's home, Mueller began showing a video and once again instructed Steven that he would have to remove his pants pursuant to the "house rules." (J.A. at 37) Steven replied "no, because I'm on – because my mom won't let me take them off." (J.A. at 38) Mueller then threatened to turn the video off. While seated on Mueller's couch, Steven unzipped his pants. Mueller, without pants or underwear, then joined Steven on the couch and pulled Steven's pants down further. Mueller then performed fellatio on Steven. Mueller again dropped Steven off at home and admonished him to keep what happened at his home a secret.

A few days later Mueller called Steven to invite him back to Mueller's home. During the conversation, Steven became quite agitated, which caught the attention of Steven's mother. After

3

overhearing Steven ask if he had to follow the house rules and remove his pants, Steven's mother instructed him to hang up the phone. Steven then told her about everything that occurred at Mueller's house, and police were contacted.

As a result of the Shrocks' complaint, Mueller was charged with third degree criminal sexual conduct. In particular, Mueller was charged with sexual conduct with a person he either knew or should have known was mentally incapable. Mich. Comp. Laws § 750.520d(1)(c). During Mueller's trial, the jury heard testimony from a number of witnesses, including Steven, his mother, and a therapist who treated Steven following the allegations of sexual abuse. Steven testified regarding his interactions with Mueller, including the alleged criminal sex acts. According to Steven, he had never seen pornographic materials prior to his contact with Mueller.

In addition, Steven's mother testified regarding Steven's developmental disabilities and his limited ability to interact with others. Shirley testified that she and her husband began to notice that "[Steven] just wasn't doing things the other kids were doing when he was about six months old." Shirley testified that when Steven enrolled in school, he was placed in special education classes and provided speech and hearing services. Steven remained in special education classes "until he left school at age 26 . . . ." (J.A. at 49) Although 33 years old, Shirley testified that Steven functions at the level of a six- to eight-year old child. Shirley estimated that Steven has an IQ between 45 and 55 and that he is able to learn things through repetition. Because he is able to learn through repetition, Steven was able to obtain a job at Arby's under a Michigan Rehabilitative Services program. Shirley also testified that Steven has difficulty making "judgment calls" and that "he's always trying to please people." (J.A. at 50)

Shirley also testified that Steven had very little knowledge of sex prior to his interactions with Mueller. In a similar vein, the jury also heard testimony from Jay McCrae of the Saginaw County Community Mental Health Authority. McCrae testified that he evaluated Steven after the allegations of sexual abuse surfaced. After some initial testing, McCrae diagnosed Steven as being "mild[ly] mentally retarded" with obsessive compulsive disorder. (J.A. at 60) According to McCrae, Steven's awareness of sex-related issues was at the "level of a five- to seven-year-old child." (J.A. at 59) On cross-examination, McCrae's assessment of Steven's sexual awareness was challenged by Mueller's counsel. Mueller's counsel questioned McCrae regarding whether Steven had a "history of sexual preoccupation." (J.A. at 60) McCrae, however, would not confirm that Steven had a sexual preoccupation.

Mueller did not put forward any witnesses in his defense and was convicted of third degree criminal sexual conduct.

## B.     Procedural Background

Following his conviction, a Michigan state trial court sentenced Mueller to 162-270 months of imprisonment. On direct appeal to the Michigan Court of Appeals, Mueller argued that there was insufficient evidence to support his conviction. *People v. Mueller*, No. 247660, 2004 WL 1366953, at *1 (Mich. Ct. App. June 17, 2004). Based on the witness testimony described above, the Court of Appeals rejected Mueller's argument and affirmed his conviction. *Id.* at *2. Mueller then filed a petition for leave to appeal to the Michigan Supreme Court, which was denied. (J.A. at 28)

After exhausting his state court remedies, Mueller filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Eastern District of Michigan.

Upon review of the record and the decision of the Michigan Court of Appeals, the district court denied Mueller's petition and concluded that "the resolution of Petitioner's sufficiency of the evidence claim was neither contrary to nor [] an unreasonable application of clearly established federal law." (J.A. at 81)

Mueller now timely appeals.

**DISCUSSION**

**SUFFICIENCY OF THE EVIDENCE SUPPORTING MUELLER'S CONVICTION FOR THIRD DEGREE CRIMINAL SEXUAL CONDUCT**

**A.      Standard of Review**

"In a habeas corpus proceeding, this Court reviews a district court's legal conclusions *de novo* and its factual findings for clear error." *Miskel v. Karnes*, 397 F.3d 446, 451 (6th Cir. 2005). This Court's power, however, to review a state court's determination regarding the sufficiency of the evidence supporting a conviction is limited by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996). Because Mueller filed his habeas petition after 1996, AEDPA governs his appeal.

AEDPA prohibits a federal court from granting a writ of habeas corpus to a person incarcerated pursuant to a state court judgment with respect to a claim that was adjudicated on the merits in state court unless the adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

28 U.S.C. § 2254(d)(1)-(2). A state court decision is contrary to clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decision arrives at a conclusion opposite to that reached by [the Supreme Court] on a set of materially indistinguishable facts." *Williams v. Taylor*, 120 S.Ct. 1495, 1523 (2000).

Moreover, a state court determination is an unreasonable application of clearly established federal law if "the state court identifies the correct governing legal principle from [the Supreme Court's] decisions, but unreasonably applies that principle to the facts of the prisoner's case." *Id.* However, when evaluating the propriety of a state court's application of a legal principle to the facts of a petitioner's case, this Court must presume the factual determinations made by the state court to be correct. 28 U.S.C. § 2554(e)(1). The presumption of correctness may be rebutted only upon a showing of clear and convincing evidence to the contrary. *Williams*, 120 S.Ct. at 1523.

A state court decision may also be unreasonable where the state court extends a legal principle to an inapposite context or refuses to extend a principle to an analogous context. *Id.* at 1520. However, a federal habeas court may not reverse a state court decision on the grounds that it was unreasonable "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established law erroneously or incorrectly." *Id.* at 1522. Instead, a federal habeas court may reverse only where the state court's application of clearly established law is "objectively unreasonable." *Id.* at 1521.

**B.** **Analysis**

Mueller does not challenge any of the factual findings of the Michigan Court of Appeals. Rather, he alleges that the Michigan Court of Appeals improperly applied *Jackson v. Virginia*, 443 U.S. 307 (1979), to find that the facts adduced at his trial supported a conviction for third degree criminal sexual conduct. We disagree.

Under *Jackson*, a petitioner challenging a state court conviction "is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." 443 U.S. at 324. In examining the sufficiency of the evidence to support a state conviction, this Court must give deference to the fact-finder's determination based on "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* at 319.

This Court "will reverse a judgment for insufficiency of evidence only if, viewing the record as a whole, the judgment is not supported by substantial and competent evidence." *United States v. Blakeney*, 942 F.2d 1001, 1010 (6th Cir. 1991). This Court has "defined substantial evidence as being 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept to support a conclusion. It is evidence affording a substantial basis of fact from which the fact in issue can be reasonably inferred.'" *United States v. Grubbs*, 506 F.3d 434, 438 (6th Cir. 2007) (quoting *United States v. Martin*, 375 F.2d 956, 957 (6th Cir. 1967)). Circumstantial evidence alone may constitute substantial evidence where it "can sustain a guilty verdict and . . . [such] evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Hughes*, 505

F.3d 578, 592 (6th Cir. 2007) (quoting *United States v. Stone*, 748 F.2d 361, 362 (6th Cir. 1984)). In evaluating the evidence adduced at trial, this Court must "view all evidence and resolve all reasonable inferences in favor of the government." *Id*.

The Due Process Clause of the Fourteenth Amendment requires that the prosecution prove "all elements of the offense charged, and must persuade the fact finder 'beyond a reasonable doubt' of the facts necessary to establish each of those elements." *Sullivan v. Louisiana*, 508 U.S. 275, 277-78 (1993) (internal citations omitted). Therefore, in reviewing the sufficiency of the evidence to support a jury's verdict, this Court must "do so 'with explicit reference to the substantive elements of the criminal offense as defined by state law.'" *Parker v. Renico*, 506 F.3d 444, 447 (6th Cir. 2007) (quoting *Jackson*, 443 U.S. at 324 n. 16).

To sustain a conviction for third degree criminal sexual conduct under Mich. Comp. Laws § 750.520d(1)(c), the prosecution must prove, beyond a reasonable doubt, that (1) "[a] person engag[ed] in sexual penetration with another person;" (2) the other person must have been mentally incapable, mentally incapacitated, or physically helpless; and (3) "[t]he actor knows or has reason to know that the victim is mentally incapable, mentally incapacitated, or physically helpless." Mich. Comp. Laws § 750.520d(1)(c). Mueller alleges that the evidence adduced at trial was insufficient with respect to the latter two prongs of third degree criminal sexual conduct. We find Mueller's argument to be wholly unpersuasive.

### 1. Victim's Mental Capacity

Under Michigan law, a person is "mentally incapable" where the person "suffers from a mental disease or defect that renders that person temporarily or permanently incapable of appraising the nature of his or her conduct." Mich. Comp. Laws § 750.520a(i). In *People v. Breck*, 584 N.W.2d 602 (Mich. Ct. App. 1988), the Michigan Court of Appeals noted that "the rationale behind the statutes prohibiting sexual relations with a mentally incapable person is that such a person is presumed to be incapable of truly consenting to the sexual act." *Id*. at 605.

Based on the rationale of the statute, the *Breck* court rejected a defendant's assertion that the statute was intended to reach only those mental disabilities which impact a person's ability to "understand the physical nature of the act." *Id.* at 603. Instead, the court read the term "mentally incapable" to include "not only an understanding of the physical act but also an appreciation of the nonphysical factors, including the moral quality of the act, that accompany such an act." *Id.* Applying this definition, the *Breck* court found that the victim was "mentally incapable" based on the fact that the victim was unable to understand the "long-term ramifications of safe sex" or "the nature of a romantic relationship." *Id.* at 605. Moreover, the victim was deemed to be mentally incapable because of testimony from a psychologist indicating that the victim "was a trusting individual who would quickly make a person his friend and do anything that person asked him to do." *Id.* The psychologist also testified that the victim was "unable to make personality or character judgments." *Id*. Taken together, the court found that the evidence established that the victim was mentally incapable of "appraising the nature of his conduct." *Id.*

Similarly, in *People v. Cox*, 709 N.W.2d 152 (Mich. Ct. App. 2005), the defendant appealed a conviction for third degree criminal sexual conduct, alleging that there was insufficient evidence to support a finding that the victim was mentally incapable. There, the defendant engaged in oral sex with a seventeen year-old victim who was alleged to be mentally incapable. During the defendant's trial, the victim testified regarding the sex acts between him and the defendant, stating "I just wanted to try something new and so he asked me if I wanted to, and I said yeah, so we went on." *Id.* at 156. Various caseworkers and psychologists testified that the victim was unable to live on his own, was easily manipulated and functioned at a "'borderline' range of intelligence." *Id.* In the opinion of these experts, the victim was "developmentally around the age of eleven, twelve or thirteen." *Id.* One expert further testified that, although the victim was "aware of his conduct," he could not appreciate the significance of a sexual relationship with the defendant. *Id*. at 157. Based on this evidence, the Michigan Court of Appeals found that there was sufficient evidence to support a finding that the victim was "mentally incapable" within the meaning of the third degree criminal sexual conduct statute. *Id.*

In the instant case, which is like *Breck* and *Cox*, the Michigan Court of Appeals was not unreasonable in determining that there was ample evidence from which a rational trier of fact could find that Steven was mentally incapable beyond a reasonable doubt. Like the victim in *Cox*, there was evidence produced at trial regarding Steven's cognitive disabilities. For instance, Steven's mother testified that Steven was in special education classes until age 26 because of his developmental disabilities. While in school, Steven was classified as "trainable mentally impaired,"

which corresponds to an IQ of 45 to 55. (J.A. at 50) Steven's mother also testified that his ability to reason and make decisions is equivalent to that of a six- to eight-year-old child.

Additionally, as in *Breck*, the jury heard testimony from Steven's mother regarding his dependency on others to meet his basic needs, as she testified that "he would never be completely on his own in society." (*Id.*) Indeed, although Steven maintained a job at Arby's, it was obtained through a Michigan Rehabilitation Services program that matches a job coach with individuals with a mental disability to teach basic job skills and functions. Steven's mother further testified regarding his need of supervision because he is "too trusting of others," and "always trying to please people." (*Id.*)

Moreover, the jury heard testimony regarding Steven's limited knowledge regarding reproductive matters. During the trial, the prosecution offered evidence in the form of testimony that Steven's knowledge of sex prior to his encounter with Mueller was equivalent to what a young child would know, and that Steven had not asked his parents many sex-related questions. This assessment was further bolstered by the testimony of Jay McCrae of the Saginaw County Community Mental Health Authority, who evaluated Steven after the alleged sexual abuse. According to McCrae, Steven's awareness of sex-related issues is likely "on the level of a five- to seven-year-old child. It's very elementary – his awareness is very elementary of some of those concepts." (J.A. at 59)

Mueller, however, argues that the evidence adduced at trial demonstrates that Steven had an awareness of sex prior to the alleged abuse such that he could appreciate both the physical act and the non-physical factors. To support this assertion, Muller points to three pieces of evidence: (1) a diagnosis by a staff member at the Community Mental Health Authority that Steven had a "history

of sexual preoccupation;" (2) testimony that Steven told his mother that he watched "Oprah and the news" rather than pornographic materials while at Mueller's home; and (3) testimony that Steven wanted to see the pornographic materials obtained by Mueller.

Mueller's arguments regarding Steven's ability to appreciate the nature and consequences of his sexual activity, however, are unavailing when placed in the context of the totality of the evidence presented to the jury. First, the evidence suggesting that Steven had a "history of sexual preoccupation" was disputed at trial and was not corroborated by McCrae. Second, while Steven did testify that he lied to his mother regarding his viewing of pornographic materials, Mueller neglects to note that the jury heard evidence that Steven was instructed not to tell his parents about what occurred. Additionally, as *Cox* demonstrates, the mere fact that a victim may have wanted an act to occur, does not mean that the victim could consent to or understand the significance of a particular act.

Importantly, while the jury could have inferred that Steven was aware of the moral quality of his act based on the evidence cited by Mueller, it was not compelled to do so. As noted above, the jury was presented with significant evidence regarding Steven's limited cognitive abilities as well as some evidence regarding Steven's ability to consent to the sexual activity that took place. After evaluating the evidence, it appears that the jury discounted evidence of Steven's ability to consent based on its verdict. Indeed, under *Jackson* "a federal habeas corpus court faced with a record of historical facts that support conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." 443 U.S. at 326. Thus, the district court properly concluded that

13

the Michigan Courts did not unreasonably apply federal law in holding that there was adequate evidence to support a finding that Steven was "mentally incapable."

## 2. Knowledge that Victim was Mentally Incapable

Mueller also contends that there was insufficient evidence to establish that he knew or should have known of Steven's mental incapacity. This claim is also without merit.

Under Michigan law, criminal liability attaches for third degree criminal sexual conduct where the defendant knew or had reason to know of the victim's mental incapacity. Mich. Comp. Laws § 750.520d(1)(c). The Michigan Court of Appeals has noted that, in enacting the statute, "the Legislature only intended to eliminate liability where the mental defect is not apparent to reasonable persons." *People v. Baker*, 403 N.W.2d 479, 481 (Mich. Ct. App. 1986) (quoting *People v. Davis*, 301 N.W.2d 871, 874 (Mich. Ct. App. 1980)). Consequently, a defendant may be held liable for third degree criminal sexual conduct under Mich. Comp. Laws § 750.520d(1)(c) where a reasonable person would have known that the victim was mentally incapable.

In the case at bar, the Michigan Court of Appeals found that Steven's mental disability would not only have been evident to a reasonable person, but was subjectively known to Mueller based on his interactions with Steven and his comments to Steven's parents. As an initial matter, the prosecution offered evidence in the form of testimony by McCrae that a person with "mild mental retardation," such as Steven, may appear to have more severe developmental disabilities to a lay person. Thus, this testimony, if credited by the trier of fact, could serve as a basis for a finding that Steven's mental incapacity was objectively ascertainable. Moreover, the trier of fact also had ample

14

basis to support a finding that Mueller had subjective knowledge of Steven's mental impairment. Here, the jury heard testimony from Steven's mother regarding a conversation with Mueller wherein he stated he had experience with developmentally disabled individuals because his son also had a mental disability. Thus, a jury could rationally infer that Mueller recognized similar traits in Steven. Additionally, the trier of fact could rationally infer from evidence indicating that Mueller instructed Steven regarding the "house rules" requiring him to disrobe, asked Steven not to tell anyone about their activities together, and gave Steven candy, that Mueller was aware of Steven's mental disability. Thus, the district court properly found that the evidence relied upon by the State court satisfied the knowledge prong of the statute, and that therefore *Jackson* was reasonably applied.

## CONCLUSION

For the reasons set forth above, we **AFFIRM** the district court's judgment.