NOT RECOMMENDED FOR PUBLICATION
File Name: 15a0454n.06

No. 14-3143

**FILED**
Jun 16, 2015
DEBORAH S. HUNT, Clerk

### UNITED STATES COURT OF APPEALS
### FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| ROBERT POANDL, | ) | SOUTHERN DISTRICT OF |
| | ) | OHIO |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

BEFORE:    BATCHELDER, MOORE, and SUTTON, Circuit Judges

**ALICE M. BATCHELDER, Circuit Judge.**    In 2013, a federal jury found Father Robert Poandl, a Catholic priest, guilty as charged of transporting a minor in interstate commerce with the intent to engage in sexual activity with him. The charge had stemmed from a trip allegedly taken on August 3, 1991, in which Poandl transported David Harper, then ten years old, from Ohio to West Virginia, where Poandl raped the boy. Poandl now appeals his conviction, claiming numerous errors in his trial. Finding no error, we AFFIRM.

**I.**

In 2012, a federal grand jury indicted Poandl for one count of knowingly transporting an individual under the age of eighteen in interstate commerce with the intent that such individual engage in any sexual activity for which any person can be charged with a criminal offense, in

violation of 18 U.S.C. § 2423. Many witnesses testified during a four-day trial held before the federal district court. Their testimony is summarized here.

Lauren Cope, David Harper's fiancée, testified that she became aware of the sexual abuse in 2009 when she mentioned to him that she wanted their wedding to take place in a Catholic church. Harper became agitated, and terminated his relationship with Cope the next day. The day after that, Harper called Cope to explain why he had broken up with her. She convinced him to tell his parents about the abuse, and the couple eventually reunited.

Barbara Harper, David Harper's mother, testified that she and her husband, Mike, moved to Cincinnati in 1988 with their four children: Chris, Joe, David, and Amanda. Devout Catholics, she and Mike became involved in Marriage Encounters, a weekend retreat program designed to strengthen marriages. Each Marriage Encounters group featured three couples and a priest. Poandl was the priest for the Harpers's Marriage Encounters group.

In November 1990, Mike Harper lost his job. Because of this, during the spring and summer of 1991, Poandl came to their house frequently, often unannounced. When he came, he would often bring food, and once he gave the couple money to pay bills.

Although she could not remember the "exact date," Barbara believed that sometime "around August" of 1991, Poandl came by the house and told her that he had to cover a mass in West Virginia. She testified that Poandl arrived at her house before dinner, probably around 4:30 or 5:00 in the afternoon. Poandl asked Barbara if one of her sons could accompany him on the trip to keep him company and to help him stay awake at the wheel. She asked David, then ten years old, if he would be willing to go, and he initially refused. Barbara responded, "Father Bob has been so good to us, you know. Please go with him." Barbara packed David an

overnight bag and watched as Poandl and her son left. She testified that they left in a blue-gray sedan.

When David returned the next morning, Barbara noticed that he did not look well. She asked him if he was all right, to which David replied that he felt sick because Poandl had given him cornflakes with lemonade for breakfast. He asked if he ever had to go anywhere with Poandl again; Barbara answered that he did not. He then ran upstairs, clearly upset. Weeks later, Poandl came by the house and told Barbara that he would not be visiting the Harpers's house anymore because none of her sons showed promise to be priests. It is uncontested that Marriage Encounters is not a recruitment program for priests.

After the summer of 1991, Barbara noticed that David had begun to change. He would frequently have nightmares, and he began to associate with individuals who were significant troublemakers. It was not until June 6, 2009, however, that David finally told his mother what had happened in the summer of 1991.

During the cross-examination of Barbara, defense counsel attempted to elicit two pieces of information, using various issues of *Share* magazine, a monthly publication for the Marriage Encounters groups in that geographic area. First, he attempted to show that the Harpers maintained a relationship with Poandl even after he allegedly cut off ties with them in the summer of 1991. In May 1993, Barbara had written a letter that was published in *Share* magazine that expressed sadness at the transfer of "Father Bob" out of the Cincinnati area, saying that the community would miss "his presence on weekends and in our homes and our community."

Second, defense counsel attempted to prove that Poandl could not have begun a journey to West Virginia in the afternoon of August 3, 1991, as Barbara Harper had testified, because

Poandl had given a speech in Cincinnati on the evening of that day. As evidence of this contention, defense counsel introduced a May 1991 copy of *Share* magazine that announced a Community Night event scheduled for August 3, 1991, starting at 7:30 p.m., at St. William's Church, in Cincinnati, at which Poandl would discuss his trip to the Holy Land. To counter the government's attempt to show that the event might have actually taken place on a different date, Poandl also introduced the August 1991 issue of *Share* which contained two letters of note. One was a letter in Barbara Harper's handwriting, dated "August 14, 1991," on an unrelated matter. The other was dated "August 1991" and was Barbara Harper's thanks to Poandl for taking time out of his busy schedule to make a presentation on August 3. That letter said, "We and other couples present enjoyed hearing your stories from your travels to the Holy Land earlier this year." Harper testified, however, that *Share* was a homemade production and not always accurate: these Community Nights were often cancelled and the dates were often changed, so if a letter stating a definite date were submitted prior to an event, the letter might not be accurate. And Harper testified as well that she had no recollection of attending that particular Community Night event.

Paul Fredette, the priest at Holy Redeemer Church in Spencer, West Virginia, from August 1988 to August 1992, testified that he had asked Poandl to cover a mass for him. He pinpointed the date of Poandl's coverage as August 4, 1991, because he checked the journal of his now-wife, who was secretary of the parish at the time, and saw that Poandl had led mass that day.

Karen Fredette, secretary of the Holy Redeemer Church in August 1991, testified that Poandl had covered for Father Paul Fredette only once, and it was on August 4, 1991. She remembered meeting with Poandl the morning of August 4, at which point Poandl stated that he

was tired because he had only arrived in town at 3 a.m. She remembered noticing a boy sitting alone in the nave of the church who looked "tired or even sad." Poandl asked the boy to stand up during the service so the parish could thank the boy for traveling with Poandl during the night to keep him awake. When shown a picture of David Harper from 1991, she testified that he "certainly resembles the child I saw that Sunday." On cross examination, however, she admitted that she had not been able to describe the boy she had seen that Sunday when interviewed by the police in 2009. Further, she admitted that she had concluded by process of elimination that Poandl was connected to her memory of the boy sitting in the nave: She knew that only three priests had ever substituted for Father Fredette and, after going back through her journal and seeing no mention of a boy accompanying her entries on the other two priests, she decided the memory must be connected to Poandl's visit. Although there was no mention of a boy in her journal entry about Poandl either, she testified that she knew personally the other two substituting priests and knew that neither of them would have brought a boy with them.

Larry Handorf, a private investigator hired by the mission where Poandl was based in 1991, testified that during an interview of Poandl, he had admitted that "he vaguely remembered taking David somewhere out of state, but didn't think it was Spencer, West Virginia." During this interview, Poandl stated that he would frequently bring boys to travel with him and "they would help him stay awake, and they would have a Catholic experience."

David Harper, the alleged victim, then testified. He testified that Poandl took him on a trip in the late summer of 1991, around August, when he was ten-years-old. They left late in the afternoon or early evening, "probably six or five." Poandl drove a sedan that David remembered him driving on other occasions. When the two arrived in West Virginia, they spent the night in the rectory at the church. David awoke at some point in the night to find that Poandl had entered

his bed and had his hand in David's pants, fondling David's genitalia. When David asked what he was doing, Poandl replied that he was checking to see if David was wearing underwear. David fell asleep again, only to be awakened later by Poandl sodomizing him. David cried out, "What are you doing to me?" to which Poandl replied, "We're having sex." After Poandl finished, he seemed extremely remorseful and kept repeating, "I did a bad thing. I did a bad thing." After regaining composure, he said to David, "You sinned, and I sinned, and we need to pray to God for forgiveness," at which point they prayed together. David remembered semen running down his leg, to the point that Poandl told him that he should go clean himself up.

The next day, Poandl told David repeatedly to keep to himself what had happened. There was not much for breakfast at the church, so Poandl gave David cornflakes with lemonade. After the mass, Poandl took David to a breakfast place down the road, where David ate steak and eggs. David later identified this breakfast place as the Queen Bee Diner. Poandl then took David back to his family.

David testified that, once he reached puberty and understood fully what had happened, he never told anyone because he was completely humiliated by it. In 2009, however, as his nightmares were worsening, he made plans to find and kill Poandl. Simultaneously, he was contemplating suicide and had even written a suicide note. He finally divulged to his fiancée what had happened to him in 1991, because she told him she wanted their children baptized Catholic. He then told his parents, at which point he handed over a gun and a suicide note. He said that he did not want anything out of the trial other than for Poandl to be in prison and to protect other children.

During cross-examination, defense counsel attempted to point out various times that David had lied during his interview with police. First, David had said that he had received

scholarship offers for football prior to being kicked off the team because of his drug abuse, which was not true. David also admitted on the stand that he had done more than just smoke marijuana in high school; he also took LSD and pain pills. He also admitted to obtaining drugs without a prescription—a felony in Ohio—while working as a pharmacist. Defense counsel further highlighted details that David mentioned during trial but had not mentioned in his report to the police, such as semen running down his leg.

Finally, William Sabo, who was the organizer of *Share* magazine in 1991, testified that his first issue as organizer was the August 1991 issue. Because he and his wife had taken over from another couple and the transition took some time, that edition was published later than usual. He estimated that it was probably published on August 10, 1991. He further admitted that sometimes the events announced in the magazine would be rescheduled or cancelled. After Sabo's testimony, the prosecution rested.

The defense called only a few witnesses. Douglas Ibold, a police officer in Hamilton County, Ohio, testified that he had cited David Harper for marijuana possession in 2009. During this encounter, Harper had lied to Ibold about his possession of marijuana. Steve Greathouse, the manager at the Queen Bee Diner, testified that the establishment did not serve breakfast—specifically, steak and eggs—until 2001. If an individual wanted breakfast in Spencer, West Virginia, he had to go to Country Table, which was about a half mile away from the Queen Bee. Judith Hawkins, the accounting manager at Poandl's mission, testified that the mission received a car rental payment dated August 29, 1991, that may have been connected to Poandl. She also produced a list of cars owned by the mission in 1993, which showed that the mission owned only vans and pickup trucks. Finally, Gail Stone, the organist at Holy Redeemer Church, testified that she did not remember Poandl bringing a boy with him during his guest appearance at the church.

On September 20, 2013, the jury found Poandl guilty as charged for transporting David Harper in interstate commerce with the intent to engage in sexual activity with him. The trial judge sentenced him to ninety months' imprisonment. On October 4, 2013, Ponadl filed a motion for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure and a motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. The trial judge denied both motions. Poandl timely appealed.

**II.**

Poandl first contends that his conviction was premised on insufficient evidence, and thus the district court erred by denying his Rule 29 motion. "A Rule 29 motion is a challenge to the sufficiency of the evidence." *United States v. Jones*, 102 F.3d 804, 807 (6th Cir. 1996). "We review de novo the denial of a motion for acquittal based on the sufficiency of the evidence." *United States v. Blanchard*, 618 F.3d 562, 574 (6th Cir. 2010). Despite de novo review, "a defendant claiming insufficiency of the evidence bears a very heavy burden." *United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006) (citation and internal quotation marks omitted). "We must affirm the district court's decision if 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Edington*, 526 F. App'x 584, 589 (6th Cir. 2013) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "We may not weigh the evidence presented, consider the credibility of witnesses, or substitute our judgment for that of the jury." *United States v. Graham*, 622 F.3d 445, 448 (6th Cir. 2010) (internal quotation marks omitted).

Both Barbara and David Harper asserted that they were unsure of the exact date on which this incident happened. The government likely settled on August 4, 1991, as the exact date after

discovering that it was the only day that Poandl had preached in West Virginia during the summer of 1991. Once the government indicted Poandl, he began reconstructing that weekend in order to attempt to craft an alibi. But he never was able to craft a full alibi; at most, he was able only to bring into question the government's timeline.

Although Poandl denies that he raped David at any time, his primary defense of innocence consists of poking holes into Barbara and David's assertion that Poandl and David left during the afternoon of August 3, 1991. Poandl pointed to the *Share* magazine articles about his speech to prove that he was in Cincinnati into the evening of August 3, 1991. The May 1991 edition announced that his speech would take place on August 3, 1991, at 7:30 p.m. The August 1991 edition featured a letter from Barbara Harper thanking Poandl for his speech about his trip to the Holy Land on August 3. The government attempted to establish that publicized events were often postponed or cancelled and that sometimes letters would be written in advance of events. Poandl countered that the August 1991 issue was published late and that it featured a letter—also written by Barbara Harper—dated August 14, 1991. The government, in response, noted that Poandl provided no testimony of anyone who actually attended the speech, and that the letter concerning Poandl's speech was dated simply "August 1991," so it could have been written in advance of the event.

Even if Poandl did give a speech the night of August 3, 1991, there is uncontested testimony that the event would have concluded by no later than 10 p.m. And what is most troubling for Poandl is that he does not deny that he drove from Ohio to West Virginia on August 3. He simply disputes the government's timeline. In fact, had he left after 10 p.m., he might well have arrived in West Virginia around 3 a.m., which was the time Karen Fredette testified Poandl told her he had arrived.

Thus, the most Poandl can do is shift the government's timeline from the afternoon to the evening. It is uncontested that he was in Ohio on August 3, 1991 and performed mass in West Virginia on August 4, 1991. He also told the private investigator that he "vaguely remembered" taking David somewhere out of state. Karen Fredette testified that she remembered that Poandl had a child with him when he led mass at Holy Redeemer. And finally, only David Harper testified about the alleged events of that night. Clearly, the jury believed David's testimony.

Any other alleged inconsistencies—about the type of car Poandl drove or whether David ate steak and eggs at the Queen Bee Diner, for instance—are inconsequential. Although inconsistencies can tend to show unreliability, David testified about events that happened almost twenty-five years prior, at a time when he was ten years old. Details about cars and food are ultimately irrelevant to Poandl's claimed alibi. Because we look at the evidence in the light most favorable to the prosecution, we take David's testimony about the rape at its face value. In order to prevail on his insufficient evidence claim, Poandl must prove that it would have been impossible for him to commit the crime. Poandl's evidence regarding his whereabouts during that weekend falls well short of demonstrating that impossibility.

Although there is some evidence tending to support his claim of innocence, that evidence does not undermine the essence of the indictment—that during the night in question, Poandl raped the victim. We cannot say that no rational trier of fact could have found him guilty of transporting David Harper in interstate commerce with the intent to rape him.

### III.

Poandl next contends that his conviction is against the manifest weight of the evidence, and thus the district court erred by denying his Rule 33 motion for a new trial. "A motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure may be premised upon the

argument that the jury's verdict was against the manifest weight of the evidence." *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007). "Generally, such motions are granted only in the extraordinary circumstance where the evidence preponderates heavily against the verdict." *Id.* at 592–93 (internal quotation marks omitted). "A district judge, in considering the weight of the evidence for the purposes of adjudicating a motion for a new trial, may act as a thirteenth juror assessing the credibility of witnesses and the weight of the evidence." *Id.* at 593. "Our review of the trial court's ruling is limited to determining whether it was a clear and manifest abuse of discretion." *Id.*

When denying Poandl's Rule 33 motion for a new trial, the district court noted that "they asked me to sit as a thirteenth juror and to overrule what the jury decided. Had I sat as the thirteenth juror, I would have joined them in their guilty finding." Because the district court denied Poandl's Rule 33 motion, our review is limited to abuse of discretion. Our examination of the evidence in Part II dictates our conclusion that the district court did not abuse its discretion in determining that the jury verdict was not against the manifest weight of the evidence. *See United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir. 1988).

**IV.**

Poandl next challenges the inclusion in the district court's jury instructions of an "on or about" instruction. Poandl did not object to the instruction at trial. "When there is no objection to an instruction at trial, a defendant can only obtain relief if he can demonstrate plain error, and if a miscarriage of justice would otherwise result." *United States v. Wuliger*, 981 F.2d 1497, 1501 (6th Cir. 1992) (internal quotation marks and citation omitted). To demonstrate plain error, a defendant must show "(1) an error, (2) that is plain, and (3) that affects his fundamental rights." *United States v. Vazquez*, 560 F.3d 461, 470 (6th Cir. 2009). "If he satisfies these conditions,

this court has discretion to correct the error only if the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Aaron*, 590 F.3d 405, 408 (6th Cir. 2009).

Poandl's indictment charged: "On or about August 3, 1991, the defendant . . . knowingly transported . . . DH, a ten year old boy, in interstate commerce with the intent that such individual engage in any sexual activity for which any person can be charged with a criminal offense." Because of this "on or about" language, the district court instructed the jury:

> Now, at certain times during the case we heard the words "on or about." The Indictment charges that the crime happened on or about August 3rd, 1991. The government does not have to prove that the crime happened on that date certain, but the government must prove the crime happened reasonably close to that date.

On appeal, Poandl criticizes the district court for allowing the jury to rely on the "on or about" instruction to consider alternative dates after he had responded to the indictment by presenting alibi evidence for the date in question. As an initial matter, however, Poandl's entire argument is premised on his belief that his evidence was an alibi, when it is really more akin to an assertion of innocence. In fact, he never requested an alibi instruction from the district court, and he first characterized his defense as an alibi on appeal. An alibi is a "defense that places the defendant at the relevant time of crime in a different place than the scene involved and so removed therefrom as to render it impossible for him to be the guilty party." *Black's Law Dictionary* 71 (6th ed. 1990). Poandl's evidence does not place him away from West Virginia; he admits to leading mass in West Virginia on August 4, 1991. His evidence is thus simply an attempt to call into question the government's timeline, coupled with an assertion of innocence within the new timeline. *See United States v. Jett*, 18 F. App'x 224, 240 (4th Cir. 2001) (calling a defendant's alleged "alibi" an "assertion of innocence" when the defense "consisted of

testimony from [defendant] and others that he was present at the restaurant at the same time as [victim] but that he did not shoot [victim] and left the scene before the shooting occurred").

Even if we characterized Poandl's defense as an alibi, however, his argument fails. He relies heavily on *United States v. Henderson*, 434 F.2d 84 (6th Cir. 1970), to prove the inappropriateness of "on or about" instructions. This court, however, sitting en banc, limited *Henderson* to the "particular facts of that case" so that there is "no *per se* prohibition on 'on or about' jury instructions because an alibi defense is provided for a specific date." *United States v. Neuroth*, 809 F.2d 339, 340, 342 (6th Cir. 1987) (en banc). Noting that there is no "rigid formula" for determining when such an instruction is proper, the en banc court listed several factors to serve as "guidelines" for determining whether an "on or about" instruction is appropriate. *Id.* at 341–42. These factors include the specificity of the allegation in the indictment (the more specific the date, the less appropriate the "on or about" instruction) and the type of crime (the more concrete the crime, the less appropriate the "on or about" instruction). *Id.*

Here, the prosecution attempted exclusively to show that Poandl transported David Harper sometime late on August 3, 1991, or early on August 4, 1991. The crime of transporting a minor with intent to rape him is concrete in that it is "more easily pinpointed in time" than more nebulous crimes like conspiracy. *Id.* at 342. When dealing with a specific date and a concrete crime, *Neuroth* suggests that an "on or about" instruction might be error. Even if an "on or about" instruction in this case would have been error, however, *Neuroth* requires that we subject the instruction to a harmless error analysis. *Id.* An error, "not of constitutional dimension, is harmless unless it is more probable than not that the error materially affected the verdict." *Id.* Here, because Poandl did not provide evidence that he was in a different place

during the time of the crime, there were gaps in his supposed alibi. The jury thus had no reason to speculate as to whether the crime was committed on a different date, but rather simply chose to believe that the rape happened on the date claimed by the government. Any error, therefore, would have been harmless. *See Johnson v. Baker*, 35 F.3d 566 (6th Cir. 1994) (table decision). The district court did not plainly err by giving the "on or about" instruction.

## V.

Poandl next contends that the district court's inclusion of an "on or about" instruction constructively amended the indictment. "Generally, this Court evaluates claims of constructive amendments to or variances from an indictment *de novo*." *United States v. Kuehne*, 547 F.3d 667, 682 (6th Cir. 2008). "However, where no specific objection is raised regarding a constructive amendment or a variance before the district court, we are limited to 'plain error' review on appeal." *Id.* Poandl did not raise any objection to a constructive amendment or a variance. We thus review for plain error. On appeal, Poandl argues that the government was permitted to vary its proof from the indicted charge or constructively amend the indictment "by having the jury convict Poandl for an incident if it decided the incident *ever occurred*, even if on a different date, and even if at a different location."

In *Stirone v. United States*, 361 U.S. 212 (1960), the Supreme Court held that the constitutional rights of an accused are violated when a modification at trial acts to broaden the charge contained in an indictment. *Id.* at 215–16. We recognize a few types of improper modifications. An amendment "occurs when the charging terms of the indictment are altered, either literally or in effect, by prosecutor or court after the grand jury has last passed upon them." *United States v. Ford*, 872 F.2d 1231, 1235 (6th Cir. 1989) (internal quotation marks omitted). A variance, on the other hand, "occurs when the charging terms of an indictment are left

unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." *Id.* A variance rises to the level of a constructive amendment when "the terms of an indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." *United States v. Hathaway*, 798 F.2d 902, 910 (6th Cir. 1986).

The prosecution offered evidence solely regarding the August 3, 1991, date. Although Poandl may have attempted to shift the timeline, all the evidence in the case went toward that date. In his brief, Poandl admits as much, saying that "[t]he government's evidence at trial focused solely on August 3, 1991 presenting one very specific scenario as to how, when, and to where the transportation occurred." Similarly, the district court instructed the jury on the August 3 date only. The evidence at trial, therefore, was not materially different from the allegations in the indictment, and there is not a substantial likelihood that Poandl was convicted of an offense other than the charged offense of transporting David Harper on August 3, 1991, in order to rape him. The "on or about" instruction did not vary the proof or constructively amend the indictment.

## VI.

Poandl next contends that his conviction was premised on prosecutorial misconduct. Poandl admits, as he must, that at trial he failed to object to any of the alleged improper statements. Although we review de novo claims of prosecutorial misconduct that were objected to in the trial court, *United States v. Green*, 305 F.3d 422, 429 (6th Cir. 2002), we review only for plain error statements that were not objected to in the trial court, *United States v. Henry*, 545 F.3d 367, 376 (6th Cir. 2008). We reverse a conviction under plain error review only in

"exceptional circumstances [where] the error is so plain that the trial judge and prosecutor were derelict in countenancing it." *Id.* at 377. We afford "wide latitude to a prosecutor during closing argument, analyzing the disputed comments in the context of the trial as a whole and recognizing that inappropriate comments alone do not justify reversal where the proceedings were otherwise fair." *Id.* (internal quotation marks and citations omitted).

"We employ a two-step analysis for determining whether prosecutorial misconduct occurred." *United States v. Boyd*, 640 F.3d 657, 669 (6th Cir. 2011). "First, we determine whether the statements were improper." *Id.* "Second, we ask whether the remarks were so flagrant as to warrant reversal." *Id.* Under the second prong, we take into account four factors: "(1) the degree to which the conduct or remarks tended to mislead the jury or prejudice the defendant; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally put before the jury; and (4) the overall strength of the evidence against the defendant." *Id.* We review each comment or set of comments individually for potential flagrancy. *See United States v. Francis*, 170 F.3d 546, 552 (6th Cir. 1999) (citing *United States v. Monus*, 128 F.3d 376, 394 (6th Cir. 1997)). "Even if the prosecutor's conduct was improper or even 'universally condemned,' we can provide relief only if the statements were so flagrant as to render the entire trial fundamentally unfair." *Johnson v. Bell*, 525 F.3d 466, 484–85 (6th Cir. 2008).

Poandl challenges only three specific comments as being improper and flagrant, but he points to a number of others to provide the "prejudicial context within which" the three were made. First, he contends that the prosecutor charged the jury to consider potential future criminal acts by Poandl by stating, "What does David get out of this? He doesn't get any money. Is it fame? It's more notoriety? He told you he wanted justice and to protect other children from

that man right there. That's all he's asking you, very simple." At first glance, it appears that this statement was simply relaying to the jury David Harper's motivation for testifying. Poandl is correct, however, that we must analyze this comment within the context of the trial as a whole. Because of the emotionally charged nature of sexual abuse cases, a comment about "protecting other children" may very well be improper. *Cf. Martin v. Parker*, 11 F.3d 613, 616–17 (6th Cir. 1993). The prosecutor may not incite the passions and prejudices of the jury by calling "on the jury's emotions and fears—rather than the evidence—to decide the case." *Johnson*, 525 F.3d at 484. Further, the prosecutor may not imply that a defendant will commit future crimes if acquitted. *See Beuke v. Houk*, 537 F.3d 618, 649 (6th Cir. 2008). Even if it was improper, however, this comment cited by Poandl is not flagrant. Although the sexual-abuse context exacerbates possible misconduct, the statement itself must be flagrant apart from the broader context, and here this comment was isolated. *See United States v. Wettstain*, 618 F.3d 577, 589–90 (6th Cir. 2010) (finding not flagrant isolated statements about the community's drug problem). Here, although the highly charged nature of the context could lead to prejudicial comments, one isolated statement does not rise to the level of flagrancy.

Poandl's second challenged statement fails for similar reasons. Poandl contends that the prosecutor appealed to the jury's sympathy for David Harper by stating:

> I would ask you to consider David Harper. What's he gain out of this? What's he win? Trust. Trust and courage, I guess. Courage is a word I would also want you to think about with David Harper. He would want you to show the same courage. He is asking for your trust. He has exposed his life, and he would ask you to show that same courage.

Although "[n]othing prevents the government from appealing to the jurors' sense of justice, or from connecting the point to the victims in the case," *Bedford v. Collins*, 567 F.3d 225, 234 (6th Cir. 2009) (citations omitted), "the prosecution may not urge jurors to identify individually with

the victims with comments like 'it could have been you,'" *Boyd*, 640 F.3d at 670. Asking the jury to show the same courage as David Harper blurs the line between connecting the point to the victim and asking the jury to identify with the victim. Even so, this improper statement is not flagrant because, again, it was one isolated statement. Although unnecessary, it "goes no further than similar comments that have not required setting aside a [] conviction, particularly under plain error review." *Id.* (internal quotation marks omitted); *see also Bedford*, 567 F.3d at 234 (holding that the prosecutor's description of the defendant as a "demon" did not deprive him of a fair trial) (citing *Olsen v. McFaul*, 843 F.2d 918, 930 (6th Cir. 1988) (holding that prosecutor's deliberate, repeated references to defendant as a "deadbeat," a "thief," a "creep," and a "liar" did not violate due process), and *Byrd v. Collins*, 209 F.3d 486, 536 (6th Cir. 2000) (same regarding prosecutor's repeated references to defendant as a "predator")).

The final statement Poandl challenges is simply not improper. Poandl contends that the prosecutor misstated the burden of proof by stating:

> Your job here, the Court has explained, you have two duties, and I would ask you to consider one more. The last duty I would ask you to consider is that your job is not to search for doubt but to seek the truth. You seek that truth in the same collective memories of the strangers and the victim, seeking only justice and the protection of other children.

As the Seventh Circuit has held, however, "[t]here was nothing wrong with referring to trials as 'searches for truth,'" because "trials *are* searches for truth." *United States v. Harper*, 662 F.3d 958, 961 (7th Cir. 2011). There was nothing improper about this statement.

If a comment is determined not to be flagrant, we will reverse only when: "(1) the proof against the defendant was not overwhelming; (2) opposing counsel objected to the conduct; and (3) the district court failed to give a curative instruction." *Johnson*, 525 F.3d at 485. Poandl

admits that he did not object to any of the statements he challenges. His argument that his conviction must be reversed because it was premised on prosecutorial misconduct therefore fails.

## VII.

Poandl further alleges that his counsel rendered constitutionally deficient assistance in violation of his Sixth Amendment rights by failing to make various objections. Our general rule, however, is that "a defendant may not raise ineffective assistance of counsel claims for the first time on direct appeal, since there has not been an opportunity to develop and include in the record evidence bearing on the merits of the allegations." *United States v. Woodruff*, 735 F.3d 445, 451 (6th Cir. 2013) (internal quotation marks omitted). We will review an ineffective-assistance-of-counsel claim on direct appeal only where "the record is adequately developed to allow the court to properly assess the merits of the issue." *United States v. Fortson*, 194 F.3d 730, 736 (6th Cir. 1999). This is not such a case, and we decline to consider the claim.

## VIII.

Poandl finally argues that there was cumulative error in this case. "[T]o obtain a new trial based on cumulative error, a defendant must show that the combined effect of individually harmless errors was so prejudicial as to render his trial fundamentally unfair." *United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004). "However, cumulative-error analysis is not relevant where no individual ruling was erroneous." *United States v. Deitz*, 577 F.3d 672, 697 (6th Cir. 2009).

The only potentially cognizable errors here were the one or two improper—but not flagrant—prosecutorial statements and a potential—but harmless—error in the "on or about" instruction. For the reasons already stated, even the combined effect of these errors was not "so

great as to render [Poandl's] trial fundamentally unfair." *United States v. Willoughby*, 742 F.3d 229, 240 (6th Cir. 2014).

## IX.

For the foregoing reasons, we AFFIRM Poandl's conviction and sentence.

**KAREN NELSON MOORE, Circuit Judge, dissenting.** I dissent because I believe that the prosecutor's remarks were plainly improper, plainly flagrant, and plainly prejudicial. I would vacate Robert Poandl's conviction and remand the case for a new trial.

Poandl acknowledges—as he must—that he did not object to most of the prosecutor's improper remarks, except for one instance. When the prosecutor asked the jury to think about the details they would remember if they had been raped by a priest, the defense counsel objected, and there was a sidebar in which the district court warned the prosecutor that she was "this close to asking the jurors to put themselves in the position of this kid . . . ." R. 68 at 80–81 (Trial Tr. 9/19/13) (Page ID #806–07). The district court did not give the jury a curative instruction, and defense counsel did not request one. *See id.* at 81 (Page ID #807). Because Poandl did not object to any of the other comments he now challenges, we review his prosecutorial-misconduct claim for plain error. *United States v. Boyd*, 640 F.3d 657, 669 (6th Cir. 2011).

"[T]he plain-error doctrine of Rule 52(b) should be used only to correct particularly egregious errors . . . ." *United States v. Davis*, 514 F.3d 596, 615 (6th Cir. 2008). To show that the prosecutor's statements constituted plain error, Poandl must show that the comments were plainly improper and affected his substantial rights. *See id.* In other words, the error must have "affected the outcome of the district court proceeding." *Id.* (internal quotation marks omitted). If Poandl meets that burden, then we may exercise our discretion if "the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (internal quotation marks omitted).

We review claims of prosecutorial misconduct in two stages. "First, we determine whether the statements were improper." *Boyd*, 640 F.3d at 669. Second, we determine whether the prosecutor's remarks were "flagrant." *Id.*

Poandl contends that the prosecutor made two types of improper arguments. First, Poandl argues that the government made inflammatory appeals to sympathy for David Harper and played on jurors' fears that Poandl would hurt other children. Appellant Br. at 52. Second, Poandl argues that the government minimized the burden of proof. *Id.* at 58–62. I agree with my colleagues that the second category of comments was not improper or flagrant.

## I.  IMPROPRIETY

### A.  Inflaming the Passions and Prejudices of Jurors

It is well established that prosecutors "must obey the cardinal rule that a prosecutor cannot make statements calculated to incite the passions and prejudices of the jurors." *Broom v. Mitchell*, 441 F.3d 392, 412 (6th Cir. 2006) (internal quotation marks omitted). The Supreme Court has explained that prosecutors must temper their arguments to avoid unfair trials because "[the prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). Accordingly, prosecutors "may strike hard blows," but they may not "strike foul ones" in the form of "improper suggestions, insinuations and, especially, assertions of personal knowledge," which "carry much weight against the accused when they should properly carry none." *Id.*

For that reason, it is improper for a prosecutor to state or imply that the defendant will commit future crimes. *Broom*, 441 F.3d at 413; *see also Bates v. Bell*, 402 F.3d 635, 643–44 (6th Cir. 2005) (holding that comments that if jurors acquit, then they are "accomplices" to future murders were improper). It is improper to "appeal[] to the national or local community interests of jurors," meaning that prosecutors may not "urge jurors to convict a criminal

defendant in order to protect community values, preserve civil order, or deter future lawbreaking." *United States v. Solivan*, 937 F.2d 1146, 1152–53 (6th Cir. 1991) (internal quotation marks omitted). Appeals to community interests are particularly problematic when the prosecutor references controversial, contemporaneous events. *Id.* at 1153 (holding that comments that implied that the drug trade would continue if the jury did not convict the defendant were improper); *United States v. Barker*, 553 F.2d 1013, 1025 (6th Cir. 1977) (holding that it was improper for the prosecutor to tell the jury that if they acquit the defendant of bank robbery, that is like opening all the banks and saying, "Come on and get the money, boys, because we'll never be able to convict them."). And it is improper for the government to "exhort the jury to 'do its job'" and convict the defendant. *United States v. Young*, 470 U.S. 1, 18 (1985).

The criminal charges in this case are particularly likely to arouse anger and disgust. In general, "[c]ases involving sexual abuse exert an almost irresistible pressure on the emotions of the bench and bar alike. Because such cases typically turn on the relative credibilities of the defendant and the prosecuting witness, however, a strict adherence to . . . appropriate prosecutorial conduct is required to ensure a fair trial." *Martin v. Parker*, 11 F.3d 613, 616–17 (6th Cir. 1993). In recent years, there has been extensive national coverage of numerous allegations that Catholic priests have sexually abused children. Sexual-abuse cases are always emotionally charged, but the large number of allegations of sexual abuse by Catholic priests may cause jurors to feel like they must do something to stop the problem—particularly in light of the coverage about the Catholic Church's alleged failure to respond. Thus, given the extraordinarily emotional nature of this case, it was incumbent on the prosecutors to toe the line between hard and foul blows.

Poandl argues that the prosecutor crossed that line numerous times. In particular, Poandl cites the way the government created and exploited its theme: trust—the trust Poandl received from the Harpers, the trust Poandl allegedly exploited, and the trust David Harper placed in the jury. *See, e.g.*, R. 68 at 22, 30 (Trial Tr. 9/19/13) (Page ID #748, 756). The government touched on this trust theme early and often. During opening statements, the prosecutor told the jury that the evidence the government planned to present was "about the trust that was gained from Bob Poandl, the trust that was exploited by Bob Poandl, the trust that was broken by Bob Poandl. And the trust that is requested . . . and that's the trust that David Harper is going to ask you to give him." R. 66 at 34 (Trial Tr. 9/16/13) (Page ID #694). During summation, the government revisited this theme. R. 68 at 27 (Trial Tr. 9/19/13) (Page ID #753). At the beginning of summation, the prosecutor showed the jury a picture of ten-year-old David Harper and told the jury that "[a]t the time of this photograph, he was taken by a man he trusted, a man his family trusted . . . from his home . . . to Spencer, West Virginia, . . . where he was first fondled and then anally raped by Father Poandl during the night." R. 68 at 19 (Trial Tr. 9/19/13) (Page ID #745). When discussing Barbara Harper's testimony, the government emphasized that "[s]he gave her boy to the priest, a priest that she had been taught to respect and to obey, the priest she had grown to trust because he gave them things." *Id.* at 21 (Page ID #747). And the prosecutor told the jury that Poandl "used his position as a priest to gain that trust, to exploit that trust, to break that trust, to betray that trust." *Id.* at 22 (Page ID #748). The government argued that, as a result of the rape, David Harper had a hard time trusting people. *See id.* at 28–29 (Page ID #754–55).

In contrast, the government implied that Harper could trust the jury, and—problematically—could trust them to convict Poandl:

> And, finally, ladies and gentlemen, I ask you about trust and trust that was requested. It's requested by David Harper. What does David—and the Court just

instructed you. What does David get out of this? He doesn't get any money. Is it fame? It's more notoriety? *He told you he wanted justice and to protect other children from that man right there. That's all he's asking you, very simple.* And to try to gain this trust as he requested from you he gets to put his entire life on public display.

*Id.* at 29–30 (Page ID #755–56) (emphasis added). The implication of the prosecutor's remarks is that the jurors were the only people David Harper could trust to do the right thing.

Through the trust theme, Poandl argues, the government not only encouraged the jury to sympathize with Harper, but also imposed a duty on the jury to return a guilty verdict because David trusted them to do it. In particular, Poandl cites the final portion of the government's summation:

I would ask you to consider David Harper. What's he gain out of this? *What's he win? Trust. Trust and courage, I guess. Courage is a word I would also want you to think about with David Harper. He would want you to show the same courage. He is asking for your trust. He has exposed his life, and he would ask you to show that same courage.*

*Id.* at 32 (Page ID #758) (emphasis added). The implication was that David Harper finally could trust someone to be courageous enough to hold Poandl accountable; it was an appeal to the jury to restore David's ability to trust people. Although this appeal to the jury's sympathies and prejudices was not explicit, the implications were improper.

In addition, the prosecutor made numerous references to "boys," which strongly implied that Poandl abused other boys. At various times throughout the closing argument, the prosecutor referenced "boys"—boys other than David Harper. At the beginning of the summation, the prosecutor told the jury that Poandl had "*a custom of taking boys with him* when he traveled out of state because he wanted to teach them things and to help him stay awake." *Id.* at 20 (Page ID #746) (emphasis added). He added, "I want you to remember that phrase." *Id.* Later, the

-25-

prosecutor told the jury to consider that "Father Poandl said[] that he takes *boys* . . . ." *Id.* at 25 (Page ID #751) (emphasis added). Toward the end of summation, the prosecutor again told the jury "to remember a phrase . . . 'The boy is to keep me awake.' *Every time*, it was, '*boys* to keep me awake.' *That was his excuse*, "*boys* to keep me awake' . . . ." *Id.* at 32 (Page ID #758) (emphasis added). The implication was that Poandl may have taken and abused other boys on these trips. Moreover, when the prosecutor argued about why David Harper was believable, he implied that the case was about "*lives*." *Id.* at 30 (Page ID #756). And, in rebuttal, the government again referenced other children by quoting Poandl's comment to the private investigator, "It's typical for me to take *boys* on out-of-state trips." The prosecutor continued, "[Poandl] called it *'the Catholic experience.'* I don't know what that is . . . ." *Id.* at 77 (Page ID #803). The less-than-subtle implication of this comment was that the "Catholic experience" was the sexual abuse.

Although the government's references to "boys" and "lives" may not have been improper in isolation, they were problematic in the context of the entire summation. The government referenced the trust Harper requested from the jury and reminded the jury that Harper "wanted justice and to protect other children from that man right there. That's all he's asking you, very simple." *Id.* at 30 (Page ID #756). This remark implied that David Harper was asking the jury to protect other children, and the government had insinuated throughout the argument that Poandl had done it before. To make matters worse, the government mentioned protecting other children a second time: "You seek that truth in the same collective memories of strangers and the victim, seeking only justice and the protection of other children." *Id.* at 33 (Page ID #759).

The government persuasively argues that the prosecutor was explaining that David Harper's motivation for testifying was to protect other children in response to defense counsel's

numerous attacks on Harper's credibility. Appellee Br. at 54–56. David Harper's credibility was a critical issue at trial. He was the only witness to the alleged sexual abuse. Poandl's trial counsel spent an extraordinary amount of time questioning David Harper about the specifics of his memory and unsavory aspects of his background that might make him less credible. *See, e.g.*, R. 62 at 51–54 (Trial Tr. 9/17/13) (Page ID #539–42) (cross-examination about David Harper's drug use); *id.* at 64–65 (Page ID #552–53) (cross-examination about past felonies and statements to the police). And Poandl's closing argument emphasized many reasons for the jury to question Harper's credibility. *See* R. 68 at 51–53 (Trial Tr. 9/19/13) (Page ID #777–79). When we consider the propriety of the prosecutor's remarks, we must consider whether defense counsel "invited" the prosecutor's responsive remarks. *United States v. Henry*, 545 F.3d 367, 381 (6th Cir. 2008) (citing *Young*, 470 U.S. at 11–12). The government may rehabilitate witnesses or respond to defense counsel's attacks on a witness's credibility. *Davis*, 514 F.3d at 615–16. Given that Poandl challenged Harper's credibility extensively throughout trial, it was proper for the government to address David Harper's credibility and motivation.

The trouble, however, is that these comments about other children were not isolated or obviously limited to discussions about Harper's credibility; they were part of a broader argument about Poandl's alleged custom of bringing boys on trips and the insinuation that he abused them, as well. *See* R. 68 at 20 (Trial Tr. 9/19/13) (Page ID #746). Moreover, the prosecutor told the jury that David Harper was asking them for "justice and to protect other children from [Poandl]." *Id.* at 30 (Page ID #756). Thus, the prosecutor's remarks about other boys and the need to protect other children were improper.

**B. The Golden Rule**

Poandl also argues that the prosecutor encouraged the jury to sympathize with David Harper and vouched for David's credibility. Appellant Br. at 54 n.9, 58. Attempts "to ensure a conviction . . . by appealing to the emotions of the jury and attempting to elicit sympathy for the victim" are improper. *Moore v. Gibson*, 195 F.3d 1152, 1171–72 (10th Cir. 1999).

There are myriad appeals for sympathy for David Harper throughout the record. The most egregious example, which the district court noted was "this close to asking the jurors to put themselves in the position of this kid," asked the jurors to "think about when [they] were ten." R. 68 at 80 (Trial Tr. 9/19/13) (Page ID #806). In particular, the prosecutor asked the jurors to think about what they would remember if they had been raped at the age of ten:

> [T]hink about when you were ten. What stuck out to you if you were somewhere? . . . More importantly, would it be the room that you were raped in? Would that be what you remember? Would the fact that a grown man who your mother and your father taught you to trust and taught you to obey, would you remember those details?

*Id.* These appeals for the jury to put themselves in David Harper's position as a ten-year-old boy are plain violations of the "golden rule." Golden-rule comments are "universally condemned because [they] encourage[] the jury to 'depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence.'" *Lovett ex rel. Lovett v. Union Pac. R.R. Co.*, 201 F.3d 1074, 1083 (8th Cir. 2000) (quoting *Spray-Rite Serv. Corp. v. Monsanto Co.*, 684 F.2d 1226, 1246 (7th Cir. 1982)); *see also Ross v. Pineda*, 549 F. App'x 444, 451 (6th Cir. 2013). Thus, the prosecutor's comments were improper.

## II. FLAGRANCY

We will not reverse a conviction because of improper comments unless the comments were also flagrant. *Davis*, 514 F.3d at 613. To determine whether the comments are "flagrant,"

we consider four factors: "(1) the degree to which the conduct or remarks tended to mislead the jury or prejudice the defendant; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally put before the jury; and (4) the overall strength of the evidence against the defendant." *Boyd*, 640 F.3d at 669 (citing *United States v. Francis,* 170 F.3d 546, 549 (6th Cir. 1999)). Even when the prosecutor's comments are not flagrant, we may reverse if defense counsel objected, the proof of guilt was not overwhelming, and the trial court did not give the jury a proper limiting instruction. *Francis*, 170 F.3d at 550.

There is little doubt that the government's insinuation that Poandl abused or would abuse others was prejudicial to Poandl given the prevalence of media coverage of numerous allegations of sexual abuse by priests. The Majority concludes that the prosecutor's remarks were "isolated," and therefore not flagrant. To the contrary, the remarks were extensive; the government used words "boys," "lives," "custom," "every time," or "children" at least thirteen times. It is also apparent that the government planned to say some of its improper remarks because both prosecutors used the trust theme and the statements about Harper's trust in the jury were part of that theme. Moreover, even if the government did not plan to ask the jury to think about what they would remember in Harper's situation, that comment is obviously improper; there are admonitions to avoid that line of argumentation in every trial-advocacy book on the market. *See, e.g.*, Doug Norwood, Prosecutorial Misconduct in Closing Argument § 12.5 (2014) ("Using the 'Golden Rule'"); Fred Lane, 4 Lane Goldstein Trial Technique § 23:33 (3d ed. 2014); 75A Am. Jur. 2d Trial § 547 (2015). Thus, the government's improper remarks were prejudicial, extensive, and deliberate. *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001).

The more difficult question is whether the strength of the evidence against Poandl neutralizes the harm of the improper comments. The strength of the evidence of Poandl's guilt depended entirely on David Harper's credibility—the credibility of his claim that he went to Spencer, West Virginia, and his assertion that Poandl raped him. The government offered evidence to corroborate Harper's version of events. The Fredettes testified that a boy accompanied Poandl to Spencer. Poandl also admitted that he remembered taking Harper on a trip, although he denied that it was the trip to Spencer.

On the other hand, Poandl offered evidence that undermined Harper's version of events. Barbara's and David Harper's testimony that Poandl picked David up when it was sunny outside and before dinner does not square with the evidence that Poandl delivered a speech at 7:00 in the evening on August 3, 1991. David Harper never mentioned attending that speech before embarking on the trip to West Virginia. Poandl even provides evidence that Barbara Harper attended the event. Her "August 1991" letter to Poandl, thanking him for his speech, references details from the talk: "We are seriously considering your challenge to be pilgrims." R. 94 at 40 (Def. Ex. 94-D) (Page ID #1245). Poandl's counsel also pointed to numerous inconsistencies in David Harper's story. Moreover, nobody could corroborate the sexual abuse—as is often the case with this type of crime.

Although jury verdicts are inherently opaque, one thing is clear: the jury believed David Harper. What we cannot determine, however, is whether the jury found him credible because they felt obligated to find Poandl guilty out of sympathy for David Harper, or anger at the Catholic church, or because they thought Poandl abused other boys, or out of fear that Poandl would abuse other children. For that reason, I cannot conclude that the cumulative weight of the evidence was so strong to be sure that the prosecutor's inflammatory remarks about other boys,

the entreaty to the jury to show courage, the request to protect other children, and the violation of the Golden Rule did not affect the fairness or integrity of the proceedings. The government ignored its "duty to refrain from improper methods" and struck "foul blows." *Berger*, 295 U.S. at 88. The prosecutor's closing remarks were so "exceptionally flagrant that [they] constitute[] plain error, and [are] grounds for reversal even if [Poandl] did not object . . . ." *Carter*, 236 F.3d at 783. I dissent.